*Wandering Dago, Inc. v. Destito*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

—————————

August Term, 2016

(Argued: January 31, 2017   Final submissions: June 26, 2017
Decided: January 3, 2018)

Docket No. 16-622

—————————

WANDERING DAGO, INC.,

*Plaintiff-Appellant*,

v.

ROANN M. DESTITO, JOSEPH J. RABITO, WILLIAM F. BRUSO, JR., AARON WALTERS,

*Defendants-Appellees*,

JOHN DOES, 1-5, NEW YORK STATE OFFICE OF GENERAL SERVICES, NEW YORK RACING ASSOCIATION, INC., CHRISTOPHER K. KAY, STEPHEN TRAVERS, STATE OF NEW YORK,

*Defendants*.

—————————

B e f o r e :
CALABRESI and CARNEY, *Circuit Judges*, AMON, *District Judge*.[*]

—————————

Plaintiff-appellant Wandering Dago, Inc., ("WD") operates a food truck and brands itself and the food it sells with language generally viewed as ethnic slurs. Defendants-appellees are officials within the New York State Office of General Services

———————————

[*] Judge Carol Bagley Amon, of the United States District Court for the Eastern District of New York, sitting by designation.

("OGS") who played a part in repeatedly denying WD's applications to participate as a food truck vendor in the Summer Outdoor Lunch Program ("Lunch Program") that is organized by OGS and takes place in Albany's Empire State Plaza during the summer months. WD contends that defendants violated its rights under the First Amendment, the Equal Protection Clause, and the New York State Constitution by denying WD's application because of its ethnic-slur branding.

We conclude that the District Court erred in granting summary judgment in defendants' favor, and should instead have awarded judgment to WD. It is undisputed that defendants denied WD's applications solely because of its ethnic-slur branding. As the Supreme Court recently clarified in *Matal v. Tam*, 137 S. Ct. 1744 (2017), such an action amounts to viewpoint discrimination and is prohibited by the First Amendment. That these acts violated the First Amendment leads to the conclusion that defendants further violated WD's equal protection rights and rights under the New York State Constitution. On the facts before us, we find unpersuasive defendants' argument that their actions were unobjectionable because they were either part of OGS's government speech or permissible regulation of a government contractor's speech.

For these reasons, the District Court's judgment is REVERSED and the cause is REMANDED for the entry of a revised judgment consistent with this opinion.

REVERSED AND REMANDED.

—————

GEORGE F. CARPINELLO (John F. Dew, *on the brief*), Boies, Schiller & Flexner LLP, Albany, NY, *for Plaintiff-Appellant Wandering Dago, Inc.*

ZAINAB A. CHAUDHRY, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Andrea Oser, Deputy Solicitor General, *on the brief*), *for* Eric T. Schneiderman, Attorney General of the State of New York, Albany, NY, *for Defendants-Appellees RoAnn M. Destito, Joseph J. Rabito, William F. Bruso, Jr., and Aaron Walters.*

—————

SUSAN L. CARNEY, *Circuit Judge*:

Plaintiff-appellant Wandering Dago, Inc., ("WD") operates a food truck and brands itself and the food it sells with language generally viewed as ethnic slurs. Defendants-appellees ("defendants")[1] are officials within the New York State Office of General Services ("OGS") who played a part in twice denying WD's applications to participate as a food vendor in the Summer Outdoor Lunch Program ("Lunch Program"), an activity that is organized by OGS and takes place in Albany's Empire State Plaza annually in the summer months. WD contends that defendants violated its rights to free speech and equal protection under the United States Constitution and the New York State Constitution by denying WD's application because of its branding practices.

We conclude that the District Court erred in granting summary judgment in defendants' favor, and should instead have awarded judgment to WD. It is undisputed that defendants denied WD's applications solely because of its ethnic-slur branding. The Supreme Court's recent decision in *Matal v. Tam*, 137 S. Ct. 1744 (2017), clarifies that this action amounts to viewpoint discrimination and, if not government speech or otherwise protected, is prohibited by the First Amendment. That the action violates the First Amendment leads directly to the conclusion that defendants also violated WD's equal protection rights and its rights under the New York State Constitution. We find unpersuasive defendants' argument that their actions were unobjectionable because

---

[1] We refer to "defendants," but note that not all of the original defendants are party to this appeal. The John Does named in the complaint remain unidentified. WD's claims against the New York State Office of General Services and the State of New York were dismissed on sovereign immunity grounds; that dismissal is not challenged on appeal. Finally, WD filed a stipulation of dismissal of its claims against the New York Racing Association, Inc., Christopher K. Kay, and Stephen Travers.

they were either part of OGS's government speech or permissible regulation of a government contractor's speech.

For these reasons, the District Court's judgment is REVERSED and the cause is REMANDED for the entry of a revised judgment consistent with this opinion.

## BACKGROUND[2]

WD is a New York corporation owned and operated by Andrea Loguidice and Brandon Snooks. WD operates a food truck using the "Wandering Dago" brand, serving food for a variety of functions, including catering events, fairs and festivals, and street-side lunch service. Loguidice and Snooks declare that they view their food truck as "the people's truck" and as giving a "nod to [their] Italian heritage" and to their ancestors, who immigrated to the United States as day laborers. App. 73, 169. Using ethnic slurs in the names of their business and of the food that they sell reflects that philosophy, in their view. WD characterizes this practice as "signaling an irreverent, blue collar solidarity with its customers" and "signal[ing] to . . . immigrant groups that this food truck is for them." Appellant's Br. 3, 39. It notes that using slurs in this way can "weaken the derogatory force" of the slur or "convey affiliation with . . . members of that minority group." *Id.* at 38 (internal quotation marks omitted).

OGS is a department of the New York State government. It is charged with managing and leasing real property, building and maintaining state facilities, contracting for goods and services on behalf of the State, and providing other administrative support services. Defendant-appellee RoAnn M. Destito is the Commissioner of OGS. Defendant-appellee Joseph J. Rabito was the Executive Deputy Commissioner of OGS. Defendant-appellee William F. Bruso, Jr., is an associate attorney

---

[2] Except where indicated, the facts described here are undisputed. They are drawn primarily from the statements of material facts submitted by the parties in conjunction with their cross-motions for summary judgment in accordance with Rule 7.1(a)(3) of the Local Rules of Practice of the United States District Court for the Northern District of New York.

4

working for OGS, and defendant-appellee Aaron Walters is employed by OGS as a promotions and public affairs agent.

Empire State Plaza, in Albany, is owned by the State of New York and operated by OGS. The Plaza incorporates multiple state buildings, including the Corning Tower, four agency buildings, the Swan Street Building, the Legislative Office Building, the Robert Abrams Justice Building, the Egg Center for Performing Arts (the "Egg"), the Cultural Education Center (which contains the State Museum and the State Library), and the New York State Capitol Building, all of which are connected by an underground public concourse. The "Plaza level" of the Empire State Plaza is an open outdoor space featuring a central reflecting pool. This outdoor area, on its own, is also sometimes referred to as the Empire State Plaza. For our purposes, we use the term "Empire State Plaza" or simply the "Plaza" to refer solely to the outdoor area that is at issue in this case.

The Plaza is the site of a farmer's market on certain weekdays during the summer. Annually, several state-organized events are held in the space. These include the African American Family Day, the Hispanic Heritage Month celebration, the Food Festival, and the Fourth of July Festival. Subject to a permitting requirement, the Plaza is also occasionally used by various private groups as a site for political rallies, marches, and protests. OGS does not use the potential offensiveness of a political event as a basis for denying an application for the requisite event permit, and it does not review signs and speeches to be displayed as part of such an event in advance.

Although OGS issues permits to individuals and organizations that apply for permission to demonstrate on OGS-controlled property, including the Plaza, some demonstrations are allowed to occur without a permit, unless they present a disruption or a health or safety issue. According to OGS, the purpose of the permitting process "is to provide OGS with notice of the likely size and location of the demonstration so that

5

OGS can provide adequate services and operational management." App. 1013. Demonstrations also occur on the concourse beneath the Plaza, some with permits and some without.

Defendants contend, but WD disputes, that OGS has a consistent policy of allowing only "family-friendly" events on the Plaza when OGS is operating the event. App. 1027. Deputy Commissioner Rabito says that during African American Family Day 2010, he directed an OGS employee not to hire one of the proposed dance troupes because its dress and type of dance were deemed not family-friendly. And OGS once removed a singer from the stage during a similar event for using the n-word. Rabito asserts that, "during the course of an OGS-sponsored event on the Plaza, OGS has directed vendors that are permitted to sell products at the Plaza as part of OGS-sponsored events or programs to remove items from their stalls that violated OGS's family-friendly [policy], including replica 'black face' figurines, panties with 'Kiss Me I'm Irish' printed on them, fertility pendants with a phallus that becomes erect when a chain is pulled, and marijuana leaf belt buckles." App. 395.

In the spring of 2013, OGS began planning a program that would, daily, allow a limited number of vendors to sell food items from trucks parked at designated spots on the East Roadway, located on the east side of the Plaza, between the reflecting pool and the Egg. In prior years, a single private company under contract with the state, Sodexo, had provided food services for an outdoor lunch program, but Sodexo's contract was not renewed for 2013.

Under the new Lunch Program, OGS grants permits to qualified food vendors to participate in providing food during lunchtime hours to state employees as well as to visitors who come to the Capitol and adjacent state buildings and parks in the summer and early fall months. The Lunch Program requires vendors seeking to participate to apply to OGS for a permit. OGS determines the applicant's eligibility to participate.

6

The application for the 2013 Lunch Program informed vendors of several OGS policies. Because of their importance, we reproduce many of those policies here verbatim, notwithstanding their combined length. They included the following:

- The Office of General Services is soliciting food vendors for the 2013 Empire State Plaza (ESP) Summer Outdoor Lunch Program to be held daily on the Plaza at the Empire State Plaza in Albany, New York. The 20 week season will run from Monday, May 20th through Friday, October 4th.

- The Summer Outdoor Lunch Program Package includes: [among other things] 20 feet of vending space which includes electrical hookup and access to water . . . .

- The cost for full participation, 5 days a week for 20 weeks, is $1,500.00; participation on Wednesdays and Fridays only, for 20 weeks, is $1,000.00. All fees are due with your completed application no later than May 10, 2013. Interested parties must apply for a vending permit and meet all insurance and financial requirements in order to participate in the 2013 ESP Outdoor Lunch Program.

- Vendors will not be allowed to provide vending services at the Empire State Plaza until they are in receipt of written approval of their application to participate in the Outdoor Lunch Program.

- Unless prior arrangements have been made with OGS, all vendors are expected to complete the entire season.

- Vending hours are from 9:00 a.m. – 2:00 p.m. Vendors are not allowed to sell prior to or after these hours.

- Each vendor will be assigned a specific vending location; all space assignment will be at the discretion of OGS.

- The sale or distribution of products other than food or beverage items is prohibited.

7

- Vendors may only sell menu items approved by the Albany County Department of Health and permitted per the Vendor's vending permit for the ESP Outdoor Lunch Program. Vendors wishing to add additional items to their menu must request approval from the Albany County Department of Health and provide OGS' Bureau of Food Services with a copy of the revised permit. OGS reserves the right to prohibit the sale, display or distribution of certain items if, in its sole opinion, these items may reasonably cause concern such as public safety.

- All vendors are expected to conduct themselves with courtesy and in an orderly manner. Arguments, harassment, sexual harassment, name-calling, profane language, or fighting are grounds for revocation of the vendor permit.

- OGS reserves the right to change the location, dates, hours, or to terminate entirely the operation of the program at any time and without prior notice to the vendor.

- Vendors will not refer to themselves as "sponsor," "co-sponsor" or other terms conferring status other than of a participant.

App. 401-03 (underscoring in original).

Applicants to the 2013 Lunch Program also signed a "Plaza Vendor Permit Agreement for Empire State Plaza Vendors," agreeing to abide by the rules set forth above (among others). The permit agreement's preamble contained the following language:

WHEREAS, OGS has management supervision over the general domain of the food service operations at the Empire State Plaza (hereinafter referred to as "Plaza"),

8

> WHEREAS, the State is interested in having food vendors take part in a lunchtime food vending program for the sale and distribution of food/beverage products and services[,]
>
> WHEREAS, OGS will be operating such a food vending program, by subcontracting some or all of the responsibilities therefor[] to various independent food vendors, and
>
> WHEREAS, the Vendor wishes to sell these products in those areas and during those times OGS hereinafter designates.

App. 407.

The Lunch Program was instituted to provide lunch options to government employees and visitors. Defendants contend more specifically, but WD disputes, that the Lunch Program "was created as an extension of the cafeteria services at the [Plaza] in order to meet the practical need to provide summer outdoor lunch options, to the approximately 11,000 State employees who work at ESP, as well as visitors to the Capitol, State Museum, performing arts center (The Egg), and the various monuments and memorial[s] at [the Plaza]." App. 1026.

Defendants claim that OGS informed the public about the Lunch Program in several different ways. For example, it advertised the Lunch Program on a closed-circuit television system located throughout Empire State Plaza's concourse, but without listing the names of the vendors. It promoted the Lunch Program on its Facebook page and other social media websites. And it publicized the Program on a food critic's blog.

On February 27, 2013, Loguidice contacted OGS to inquire about WD's possible participation in the 2013 Lunch Program. On May 10, 2013, Aaron Walters of OGS left a voicemail message for Loguidice, advising her that WD could apply. On May 17, 2013, Loguidice faxed WD's application to OGS. WD's application included its proposed

9

menu, which featured sandwiches with the following names: "Dago," "Castro," "American Idiot," "Goombah," "Guido," "Polack," "El Guapo," and "KaSchloppas." App. 1034. Loguidice neglected to include the application's Appendix B, which is designed to contain the vendor's contact information and tax identification number, and a description of the type of vending operation, the space required, the applicant's electrical needs, and other details. At least ten other vendors applied to participate in the 2013 Program.

Soon after receiving WD's application, OGS officials approached Deputy Commissioner Rabito, seeking his views on WD's proposed participation in the 2013 Lunch Program. According to Rabito, he recognized the term "dago" as "a highly offensive term for Italians and his initial reaction was that the application would not be approved." App. 1034-35. Rabito recounted that he then conducted a computer search of the term "dago," which not only confirmed (he said) that it is an offensive derogatory term, but also revealed that it has been used to refer to people of Spanish and Portuguese descent, in addition to Italians. In addition, Rabito declared that he searched WD's website and saw that other offensive names appeared on its menu.

It is undisputed that Rabito thereafter denied WD's application solely because of those offensive terms, and not on other possible grounds such as the application's incompleteness. Defendants characterize Rabito's act as a denial "on the grounds that its name contains an offensive ethnic slur and does not fit with OGS' policy of providing family-friendly programming." App. 1035. WD characterizes the act as a denial merely on the ground that Rabito found its branding "offensive," without reference to "any statute[,] regulation, policy, or other source of guidance in making his decision." *Id*.

Later on the day of Rabito's denial, OGS advised all applicants other than WD that their applications to participate in the 2013 Lunch Program had been accepted.

10

Among the vendors accepted was a truck named "Slidin' Dirty," a slang reference, apparently, both to small hamburgers and to the act of driving while in possession of drugs or firearms. App. 1036-37.[3] Although none dispute that Rabito's decision rested solely on WD's offensive branding, when OGS formally notified WD of its permit denial on May 20, 2013, it cited as reasons both WD's offensive name and its failure to submit a complete application before the stated deadline. OGS approved other applications that were late and/or incomplete, however.

In the fall of 2013, OGS adopted a new procedure to assess the applications of outside vendors seeking to participate in its events and programs. Under the new procedure, each event or program would have a set of explicit criteria by which applications would be scored, and explicit scoring cutoffs to determine which applicants would be accepted.

On May 5, 2014, WD submitted a timely and complete application for the 2014 Lunch Program. The application was reviewed by OGS employees designated as the selection committee, was scored, and received a score sufficient for acceptance into the program. Nevertheless, the application was denied. WD received a letter dated May 16, 2014, from Bruso, advising it that its application had been denied "due to your firm's name as previously described." App. 659, 1018. Among the eight complete applications submitted that year, WD's was the only one not accepted.

WD filed this section 1983 lawsuit on August 27, 2013. In its amended complaint, WD alleges that OGS officials violated its rights to free speech and equal protection under the United States Constitution and the New York State Constitution by denying its application for a vendor permit in the 2013 and 2014 Lunch Programs on the basis of

---

[3] Defendants have not expressly admitted that an application for a food truck named "Slidin' Dirty" was accepted, but they have not challenged WD's factual assertion that one was.

11

its branding. WD seeks injunctive and declaratory relief, along with attorney's fees. It has abandoned its claim for money damages.

The parties filed cross-motions for summary judgment, and in March 2016, the District Court denied WD's motion, granted the defense's motion, and entered judgment in favor of defendants Bruso, Destito, Rabito, and Walters. *Wandering Dago, Inc. v. Destito*, No. 1:13-CV-1053, 2016 WL 843374 (N.D.N.Y. Mar. 1, 2016). The District Court rejected WD's argument that its speech—again, the name of its truck and food offerings—was protected by the commercial speech doctrine. Rather, it concluded that WD's speech must be considered either government speech, speech by a government contractor, or private speech in a government-owned forum, as to which the First Amendment's protections would not prevent OGS's denial. Unsure of which category applied, the court concluded that WD's claim failed under each. It also rejected WD's federal equal protection claim and the parallel free speech and equal protection claims under the New York State Constitution.

WD timely appealed.

**DISCUSSION**

WD argues that branding its business with language commonly viewed as ethnic slurs while participating in the Lunch Program at the Empire State Plaza is a form of commercial speech in a quintessential public forum, and that therefore OGS's actions must be subjected to close judicial scrutiny. Further, WD contends that, regardless of the forum's nature, defendants violated its First Amendment rights by discriminating against its viewpoint, and necessarily also its equal protection rights and rights under the New York State Constitution. It challenges OGS's contention that defendants' actions constituted government speech or regulation of a government contractor's speech, as well as the permissibility of the District Court's *sua sponte* addressing those issues. In addition, WD argues that the standard by which OGS decision-makers

12

evaluated Lunch Program applications allowed defendants, unconstitutionally, to impose prior restraints at their discretion.

While not disputing that WD's use of ethnic slurs in the branding of its food truck is a form of speech, defendants counter that the Lunch Program is a nonpublic forum; that commercial speech doctrine does not apply to speech made in this context; and that prohibiting the use of ethnic slurs is a reasonable and viewpoint-neutral regulation. Turning to the issue of discretion, defendants argue that OGS's asserted "family-friendly" policy, in both its written and unwritten expressions, sufficiently circumscribes its decision-makers' discretion in evaluating Lunch Program applications to survive constitutional challenge. They also maintain that their actions were part of OGS's government speech, or at least regulation of a government contractor's speech, and are therefore not subject to the same degree of First Amendment scrutiny as restrictions on private speech. Finally, on the same reasoning, they contend that WD's equal protection and New York State Constitution claims fail.

For the reasons set out below, we conclude that the District Court should have granted summary judgment in WD's favor and not for defendants. By rejecting WD's application only on the ground of its branding, defendants impermissibly discriminated against WD's viewpoint and therefore ran afoul of the First Amendment, whether WD's speech is categorized as commercial speech, speech in a public forum, or speech in a nonpublic forum. *See Matal v. Tam*, 137 S. Ct. 1744 (2017). Defendants' actions are not shielded by doctrines applicable to government speech and government contractor speech. Although bearing some similarities to regulation of these types of speech, defendants' actions are properly characterized as viewpoint-based regulation of private speech. In light of those conclusions, which entitle WD to the injunctive relief it seeks, we need not reach WD's facial First Amendment challenge concerning discretionary prior restraints. Finally, from our First Amendment analysis, it follows that the District

13

Court reached erroneous conclusions regarding WD's equal protection and New York State Constitution claims.

We review *de novo* "a district court's ruling on cross-motions for summary judgment, in each case construing the evidence in the light most favorable to the non-moving party." *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir. 2011). Summary judgment may be granted if there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## I. OGS's decisions to deny WD's Lunch Program applications

As set out below, the constitutionality of defendants' actions depends on what OGS was targeting—content or a viewpoint—when it denied WD's Lunch Program applications and whether WD's branding, if WD had been included in the Lunch Program, would have been WD's own private speech or, instead, a form of government speech. The answers to those questions, in turn, set the level of constitutional scrutiny we must apply as we evaluate WD's challenges to defendants' actions.

We conclude that defendants engaged in viewpoint discrimination when they denied WD's applications because WD branded its truck and products with ethnic slurs. We reject defendants' arguments that WD's speech should be seen as government speech. As a result, defendants' actions are subject to, and fail, heightened scrutiny, irrespective of whether we categorize WD's speech as commercial speech, speech in a public forum, or speech in a nonpublic forum. We therefore reverse that portion of the District Court's judgment that concerns the constitutionality of OGS's decisions to deny WD's Lunch Program applications.

### A. Viewpoint discrimination

As set out above, WD contends that defendants discriminated against its viewpoint when, because the WD truck and its products were branded with ethnic slurs, they denied WD's Lunch Program application. Defendants agree that they denied

14

WD's application because of its use of what they saw as ethnic slurs. They argue, however, that WD's use of this language did not reflect any real "viewpoint": when deposed, defendants observe, Loguidice and Snooks described their use of the language as nothing more than a "nod to [their] Italian heritage" and as part of how they presented WD as "the people's truck." App. 73, 169. According to defendants, WD's adoption of a coherent message of "irreverent, blue-collar solidarity" has been "manufacture[d] . . . post-hoc." Appellees' Br. 38. Defendants also contend that they rejected WD's application not because of any message that WD might have intended to convey, but rather because WD's use of ethnic slurs was "offensive" and not "family friendly." *Id.* at 39. For the reasons set out below, and in light of the Supreme Court's recent decision in *Matal v. Tam*, 137 S. Ct. 1744 (2017), we hold that OGS's denials amounted to viewpoint discrimination.

Government "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). "Viewpoint discrimination is a 'subset or particular instance of the more general phenomenon of content discrimination,' in which 'the government targets not subject matter but particular views taken by speakers on a subject.'" *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 150 (2d Cir. 2004) (citation omitted) (quoting *Rosenberger*, 515 U.S. at 829, 831). The government discriminates against viewpoints when it disfavors certain speech because of "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829.

As we have noted, "the distinction between content discrimination . . . and viewpoint discrimination . . . is somewhat imprecise." *Make the Rd. by Walking*, 378 F.3d at 150; *see also Rosenberger*, 515 U.S. at 831 ("[T]he distinction is not a precise one."). But the Supreme Court's recent decision in *Matal v. Tam*, 137 S. Ct. 1744 (2017), provides substantial guidance regarding viewpoint discrimination in the context of speech

15

labeled "offensive"—in particular, language generally perceived as ethnic slurs. In *Matal*, the Court addressed the constitutionality of a statutory provision "prohibit[ing] the registration of a trademark 'which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute.'" *Id.* at 1753 (quoting 15 U.S.C. § 1052(a)). The U.S. Patent and Trademark Office ("PTO") applied the statute to reject proposed marks, including that proposed in *Matal*, if a "substantial composite . . . of the referenced group would find the proposed mark . . . to be disparaging in the context of contemporary attitudes," whether or not the applicant was a member of that group or "ha[d] good intentions" in using the term. *Id.* at 1754. At issue in the case was the PTO's rejection of an application to register the mark "The Slants," the name of a musical band, which the PTO judged to be an ethnic slur offensive or derogatory to Asian-Americans. The band, whose members were Asian-American, contended that their use of the slur helped them "'reclaim' the term and drain its denigrating force." *Id.* at 1751.

Although split between two opinions, all eight Justices participating in *Matal* concluded that the PTO's rejection of The Slants' mark constituted unconstitutional viewpoint discrimination. *See id.* at 1763 (Justice Alito's lead opinion joined by three other Justices), 1765 (Justice Kennedy's concurrence joined, in relevant part, by three other Justices). Importantly, they reached that conclusion even though the trademark application at issue "was denied not because the Government thought [the applicant's] *object* was to demean or offend but because the Government thought his trademark would have that effect on at least some Asian-Americans." *Id.* at 1766 (Kennedy, J., concurring) (emphasis added); *see also id.* at 1763 (Alito, J.) ("[The statute] denies registration to any mark that is offensive to a substantial percentage of the members of any group.").

Justice Kennedy's concurrence explains further why the PTO's practice was not saved by either its "appli[cation] in equal measure to any trademark that demeans or offends" or by the PTO's disregard of "the applicant's personal views or reasons for using the mark." *Id.* at 1766. As to the first point, the concurrence stresses that "mandating positivity . . . might silence dissent and distort the marketplace of ideas" even though the mandate is applied evenhandedly to all participants. *Id.* As to the second point, the concurrence rejects the notion that the government can "insulate a law from charges of viewpoint discrimination by tying censorship to the [expected] reaction of the speaker's audience," rather than to the speaker's views or intentions. *Id.* at 1766-67. That is because "a speech burden based on audience reactions is simply government hostility and intervention in a different guise"—"[t]he speech is targeted, after all, based on the government's disapproval of the speaker's choice of message." *Id.* at 1767.

Applying *Matal* to the facts presented here leaves little doubt that defendants' actions in rejecting WD's speech are correctly seen as viewpoint, not merely content, discrimination. Wherever one might draw the line between expressions of "viewpoint" and other categories of speech content in a different context, *Matal* is clear that "[g]iving offense is a viewpoint" when it comes to ethnic slurs, *id.* at 1763 (Alito, *J.*)—at least when giving "offense" to an audience is the sole effect that the government is targeting. *See also id.* at 1766 (Kennedy, *J.*, concurring) ("[T]he Government's disapproval of a subset of messages it finds offensive . . . is the essence of viewpoint discrimination.").

In other contexts, however, ethnic slurs might cause negative effects of a different sort—that is, not mere "offense"—that the government could target without engaging in viewpoint discrimination. A hostile work environment claim under antidiscrimination law is one example. Most antidiscrimination laws "regulate[] membership and employment policies as conduct, not as expression," and "prohibit[] discriminatory membership and employment policies not because of the viewpoints

17

such policies express, but because of the immediate harms . . . such discrimination causes." *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 93 (2d Cir. 2003). These laws, while perhaps causing "viewpoint disparity" in workplaces, are generally not considered viewpoint discriminatory.[4] *Id.* Nothing in *Matal* or this opinion changes that.

Nor does *Matal* call into question the government's ability to regulate speech, including the use of slurs, that constitutes a "true threat" of violence, *Virginia v. Black*, 538 U.S. 343, 359-60 (2003), "harassment," *Hill v. Colorado*, 530 U.S. 703, 723-24 (2000), or "fighting words," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992) (observing that fighting words have an "unprotected . . . nonspeech element" (internal quotation marks omitted)); *NLRB v. Pier Sixty, LLC*, 855 F.3d 115, 124 n.46 (2d Cir. 2017) (describing fighting words as "so insulting in both content and delivery that they are likely to provoke the listener to respond violently"). Defendants here, however, have not argued that WD's speech falls within these unprotected categories.

Ultimately, we think *Matal* compels the conclusion that defendants have unconstitutionally discriminated against WD's viewpoint by denying its Lunch Program applications because WD branded itself and its products with ethnic slurs. Although ethnic slurs are used to express a variety of opinions and obtain a variety of effects, under *Matal* the mere use of these potentially offensive words in the factual setting presented here reflects a viewpoint and cannot be framed by the government as a larger viewpoint-neutral category of speech content available to advance multiple viewpoints and therefore subject to less First Amendment protection.

Thus, contrary to defendants' suggestion, we need not delineate the full extent of the message that Loguidice and Snooks were trying to convey. Whatever the intended

---

[4] Antidiscrimination laws can, of course, raise First Amendment concerns of a different sort, relating to associational rights. *See, e.g., Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987).

message, WD's use of ethnic slurs reflects a viewpoint about when and how such language should be used. Further, it matters not that defendants, like the PTO in *Matal*, might well have targeted ethnic slurs solely because of the audience's expected reaction, rather than because of WD's intended message. Defendants engaged in viewpoint discrimination here even if the denial of WD's application resulted from an across-the-board prohibition applicable to all speakers without regard to their intended messages.

In light of the clarification provided by *Matal*, therefore, we conclude that the District Court erred in its assessment: the undisputed facts show that defendants did engage in viewpoint discrimination when they denied WD's Lunch Program applications solely because the WD truck and its products were branded with ethnic slurs. Given *Matal*'s clarity on this point, we think it unnecessary to discuss at length earlier precedents that could be interpreted as supporting a different conclusion.[5]

### B.     Government speech and government contractor speech

Defendants further contend, however, that any viewpoint discrimination on their part is of no moment because OGS's denial of WD's application should be understood as a permissible manifestation of OGS's own government speech—a refusal to endorse

---

[5] In *Perry v. McDonald*, for example, we concluded that a state did not engage in unlawful viewpoint discrimination when it rejected a request for a "SHTHPNS" vanity plate, while at the same time allowing plates such as "COWPIES," "POOPER," and "BM." 280 F.3d 159, 170-71 (2d Cir. 2001). Although all the language on the plates was scatological, "SHTHPNS" was the only "offensive" plate because it contained "easily recognizable profanities." *Id.* We held that the government was not targeting the worldview underlying the phrase "shit happens," but rather the use of profanities to express that philosophy, and that the latter objective did not amount to viewpoint discrimination. Of course, following the Supreme Court's decision in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, the state's rejection of the vanity plate might now be permitted on the alternative ground that the plate's language constituted government speech. 135 S. Ct. 2239, 2246 (2015) ("[S]pecialty license plates issued pursuant to Texas's statutory scheme convey government speech.").

19

ethnic slurs in a state-sponsored program—or as lawful regulation of speech made by a government contractor.[6] We are not persuaded by these arguments.

### 1. Government speech

"When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2245 (2015). When it acts as a speaker, the government is entitled to favor certain views over others. *See id.* at 2251. The question is whether speech by the vendors participating in the Lunch Program—an event involving both the government and private individuals—is properly characterized by defendants as government speech. For the reasons set out below, we find the government speech characterization inapt here.

The Supreme Court has identified forms of speech belonging to the government despite private individuals' involvement. In *Walker*, the Court held that specialty automobile license plates issued by Texas were government speech over which the government could exercise editorial control. The Court cited three factors underlying its conclusion: (1) "the history of license plates show[ed] that . . . they long ha[d] communicated messages from the States," *id.* at 2248; (2) "license plate designs [we]re often closely identified in the public mind with the [State]," *id.* (internal quotation marks omitted); and (3) "Texas maintain[ed] control over the messages conveyed on its specialty plates," *id.* at 2249. Applying a similar framework, the Court has also found to be government speech a city's refusal to place a private group's permanent religious monument in the city's park alongside other religious and secular displays. *Pleasant Grove City v. Summum*, 555 U.S. 460, 481 (2009). Explaining its rationale, it cited the

---

[6] We note that the District Court raised and addressed these issues *sua sponte* without affording WD an opportunity to be heard on them. These issues, however, are legal in nature and, on appeal, have been fully briefed by both parties. In the interest of judicial economy, we therefore reach them now.

history of government use of monuments to speak to the public; the fact that observers generally expected permanent monuments to convey a message on the property owner's behalf; and the city's control over the selection of monuments. *Id.* at 470-73.

At the same time, however, speech that is otherwise private does not become speech of the government merely because the government provides a forum for the speech or in some way allows or facilitates it. *See, e.g.*, *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811-13 (1985) (holding that a charity drive organized by government was nonpublic forum for private speakers to solicit donations, and therefore that viewpoint discrimination was prohibited); *Latino Officers Ass'n, N.Y., Inc. v. City of N.Y.*, 196 F.3d 458, 468-69 (2d Cir. 1999) (holding that a police department's refusal to permit police affinity group to march in parades was not a form of government speech). In its recent decision in *Matal*, the Supreme Court held that trademark registration, and the PTO's refusal to register marks deemed offensive, was not a form of government speech. *Matal*, 137 S. Ct. at 1757-60. The *Matal* Court unanimously underscored that it exercises "great caution before extending [its] government-speech precedents," citing the risk that "private speech could be passed off as government speech" and "silence[d]" by "simply affixing a government seal of approval." *Id.* at 1758. It characterized *Walker*'s holding allowing state regulation of license plate content as "mark[ing] the outer bounds of the government-speech doctrine." *Id.* at 1760.

Applying the *Walker/Summum* factors here, we find it hard to accept the proposition that OGS's denial of WD's application was a form of government speech, rather than regulation of private speech. Unlike in both *Walker* and *Summum*, defendants have not pointed to any record evidence of a well-established history of OGS's controlling the names of Lunch Program vendors in order to tailor a government message. They concede that the Lunch Program has existed for only "a few years," and

21

the history they cite is a general history of "sponsor[ing]" assertedly "analogous programs" in the Plaza. Appellees' Br. 58.

Further, to the extent that OGS does have a history of screening applications for various permits to use Empire State Plaza, we see little to distinguish OGS's role from the role filled by any state or local government entity that decides whether to grant permits to use any public lands. The record contains no basis for thinking that Lunch Program vendors' names, any more than the names of other organizations that receive permits to use public lands for special events, are closely identified with the government "in the public mind." *Matal*, 137 S. Ct. at 1760. In addition—drawing on the Court's reasoning in *Summum*, which also involved the use of public land—we find it significant that the food vendors participating in the Lunch Program are a merely temporary feature of the landscape, and quite visibly so. In *Summum*, by contrast, the Court rested its holding in part on the notion that observers of a monument placed on government property would, partly from its permanence, generally infer that the monument expressed a message endorsed by the government. *See* 555 U.S. at 470-73.

Having said that, we acknowledge that the Lunch Program is more than simply a grant of access to public lands to which OGS has affixed a government seal and a "program" designation. More than simply access to Empire State Plaza, OGS provides additional assistance to vendors by publicizing the program and by providing vendors with access to electricity and water on the Plaza through facilities installed there. We have little trouble rejecting the argument that OGS was expressing its own views when it refused to allow WD *physical access* to Empire State Plaza—apart from this further assistance—during the Lunch Program. But we think a more difficult question is posed by OGS's declining, because of WD's branding, to provide facilities and promotional support for WD's participation in the Lunch Program. The First Amendment might

22

conceivably bar the former action (preventing physical access) but not the latter (refusing additional support).[7]

The additional assistance provided to permitted vendors by OGS lends support to defendants' assertion that WD's participation would be perceived by the public as government speech, and also implicates another line of argument that is not clearly expressed in their brief: that government may "set spending priorities" and "selectively fund . . . activities it believes to be in the public interest." *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 588 (1998). Arguably, OGS's modest additional assistance was a form of selective funding. This argument, however, raises "a notoriously tricky question of constitutional law." *Matal*, 137 S. Ct. at 1760 (Alito, *J.*). In general, "if a party objects to a condition on the receipt of [government] funding, its recourse is to decline the funds," but sometimes "a funding condition can result in an unconstitutional burden on First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2328 (2013).

Still, even taking account of the possible import of OGS's additional assistance, we conclude that the record in this case cannot support concluding that OGS expressed its own message by denying WD's Lunch Program applications. For all the reasons already reviewed above, we find it implausible that OGS, by permitting WD's full participation in the Lunch Program, would be viewed by the public as having adopted WD's speech as its own. In *Matal*, the PTO "d[id] not dream up the[] marks"; it merely registered them, a service provided to many trademark applicants. *Matal*, 137 S. Ct. at 1758. Here, OGS did not "dream up" or adopt WD's branding, nor would a reasonable

---

[7] Of course, within the bounds of the First Amendment, OGS may place content-neutral restrictions on the time, place, and manner of speech delivered on government property. But defendants have not argued that their denial of WD's application was motivated by legitimate concerns about the time, place, or manner of WD's speech (*e.g.*, crowding). Rather, their denial was motivated by the speech's viewpoint.

observer think it did so simply because of the incidental assistance that OGS provides to Lunch Program vendors.

We arrive at the same conclusion when the issue is framed in terms of OGS's entitlement to fund private speech selectively. To begin with, we are not so sure that OGS's incidental assistance to vendors constitutes a significant government benefit separate and apart from providing access to the forum itself. As we discuss below, the government's making available a forum for private speech does not constitute a "subsidy," and is circumscribed by a specific set of constitutional restrictions that includes a rule against viewpoint discrimination. It is true that OGS's local publicity efforts and provision of on-site water and electricity sources are not elements of the most basic definition of the "forum" at issue here: Empire State Plaza as a physical space. But in creating forums for private activity, the government sometimes furnishes services or tangible goods, not access to a physical space. In *Cornelius*, for example, the private speech occurred in literature produced by the government to promote a charity drive. *See Cornelius*, 473 U.S. at 791.

As Justice Alito observed in a portion of his *Matal* opinion joined by three other Justices, the government's provision of a speech-facilitating service (there, trademark registration) in return for a fee—in the case of the Lunch Program, a $1500 fee—hardly resembles a typical government subsidy, *see Matal*, 137 S. Ct. at 1761 (Alito, J.), and perhaps in some instances looks more like creating a forum, *see id.* at 1763 (suggesting that forum doctrine, rather than precedents about "government programs," might be the proper framework for understanding trademark registration). In addition, treating as government "subsidies" not only "cash subsidies or their equivalent," but also "government service[s] . . . utilized by only some, *e.g.*, the adjudication of private lawsuits and the use of public parks and highways," *id.* at 1763 (Alito, J.), would empower government to place speech-related conditions on citizens' access to

24

numerous essential public services. Adopting such a capacious view of government's prerogative to fund speech selectively would represent a step far beyond Supreme Court precedent and likely conflict with the fundamental purposes of the First Amendment.

But even were we to accept the theory that OGS "subsidizes" Lunch Program vendors' speech beyond merely creating a forum, we do not think that defendants have avoided the First Amendment's prohibition of government viewpoint discrimination. We acknowledge that "viewpoint-based funding decisions can be sustained [as government speech] . . . [w]hen the government disburses public funds to private entities to convey a governmental message." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) (internal quotation marks omitted). This principle does not apply, however, when a government program is not designed to "promote a governmental message." *Id.* at 542. When a government program's very concept contemplates presenting a diversity of views from participating private speakers, the government may not then "single out a particular idea for suppression because it [is] dangerous or disfavored." *Id.* at 541; *see also Nat'l Endowment for the Arts*, 524 U.S. at 587 ("[E]ven in the provision of subsidies, the Government may not ai[m] at the suppression of dangerous ideas." (internal quotation marks omitted)). Further, the government "cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise." *Legal Servs. Corp.*, 531 U.S. at 547.

The design of the Lunch Program conflicts with the notion that OGS somehow employs the program—and the language used by the vendors—to convey a government message. Defendants stress that OGS aims to make the Lunch Program "family-friendly," and we do not doubt that that is so. But the record does not document OGS's having organized the Lunch Program for the purpose of conveying any message at all. The purpose was to provide casual outdoor lunch options to state

25

employees and visitors to the capital. And the structure of the program—inviting outside vendors to bring their own food trucks—seems to contemplate that, through signs and advertising décor to differentiate one from the other, participating vendors will bring some of their own diverse personal expression—not government messages—to Empire State Plaza. Nor does the record reflect that the vendors accepted into the Lunch Program are selected because of their ability to help convey a coherent government message. Instead, the reasonable inference to be drawn from the record is that the Lunch Program generally accepted all applicants during the relevant time period, and WD's rejection was exceptional: for both the 2013 Lunch Program and the 2014 Lunch Program, every vendor who completed an application was accepted, except for WD. OGS's acceptance of the "Slidin' Dirty" truck in the Lunch Program further illustrates the point.

We do not doubt that the government has a legitimate interest in promoting family-friendly messages, speaking directly itself or through selective subsidies. But on the undisputed facts in the record before us, we are unable to conclude that OGS was aiding the transmission of a government message by denying WD's Lunch Program applications.

For these reasons, we conclude that defendants' actions were not OGS's "government speech." The government speech doctrine therefore offers defendants no refuge from the First Amendment's prohibition of viewpoint discrimination.

**2.      Government contractor speech**

Defendants also argue that OGS's actions should be seen as conditions placed on a prospective government contractor's speech—that is, WD's speech—and thus are subject to, and satisfy, the balancing of interests described by *Board of County Commissioners, Wabaunsee County v. Umbehr*, 518 U.S. 668 (1996) (holding that First Amendment requires fact-intensive and deferential balancing of government's interests

26

against government contractors' speech interests, in line with the standard applied to government employees under *Pickering v. Board of Education*, 391 U.S. 563 (1968)). We reject this argument as well.

Defendants point out that OGS conceived of the Lunch Program as a substitute for the government's prior contract with Sodexo to provide lunch at the Plaza during the summer months, and that the Lunch Program vendor application materials advised that OGS planned to "subcontract[]" food service operations to interested vendors. App. 407. But defendants cite no authority for the proposition that these facts alone effectively render WD a prospective government contractor. Neither *Pickering* nor its progeny, including *Umbehr*, relied on by defendants, are on point. In those cases, the government agreed to pay public moneys to private individuals for services to be rendered, and therefore had a stronger interest in restricting those individuals' speech than in restricting the speech of the public at large. *See Umbehr*, 518 U.S. at 675-78; *Pickering*, 391 U.S. at 568.

Our factual setting differs significantly. It is true that the Lunch Program is an economic arrangement involving OGS and private vendors—an arrangement that OGS is not compelled to enter into—and that the vendors stand to generate revenue for themselves as a result of the arrangement. It is also true that OGS indirectly benefits from the goods and services the food vendors provide as part of this exchange: through the program, it provides its employees outdoor lunch options. But that is where the resemblance to government contracting ends. What OGS provides in this exchange is access to a forum—an issue governed by forum doctrine, not *Umbehr*—and modest nonmonetary assistance that facilitates the use of that forum. And it is those employees and other private citizens, *not* OGS, that actually pay the food vendors for their goods and services and directly benefit from them. The only monetary exchange between the food vendors and OGS is a fee paid *by* the vendors *to* OGS.

27

In light of those considerations, we see the food vendors not as government contractors, but rather as private entities that pay to access public benefits and, in using those benefits to their economic advantage, secondarily satisfy a government purpose. To categorize WD as a prospective government contractor would represent a considerable and, we think, unwarranted expansion of *Umbehr*. We therefore reject defendants' argument and decline to analyze WD's speech under a government contractor rubric.

**C.      Whether defendants' viewpoint discrimination was justified**

Defendants have not argued that their actions, if correctly characterized as viewpoint discrimination against WD's private speech, were sufficiently justified by OGS's governmental interests to survive First Amendment scrutiny. Nor do we think that that argument could be successfully made here, but we address it briefly to complete the analytical picture.

In general, government viewpoint discrimination against private speech violates the First Amendment unless it is narrowly tailored to achieve a compelling government interest. *Amidon v. Student Ass'n of State Univ. of N.Y. at Albany*, 508 F.3d 94, 105-06 (2d Cir. 2007); *Husain v. Springer*, 494 F.3d 108, 128 n.14 (2d Cir. 2007). This rule applies to private speech delivered on public property regardless of how the property is categorized under forum doctrine. *See Make the Rd. by Walking*, 378 F.3d at 142-43. It is therefore unnecessary for us to identify the type of forum at issue here before assessing whether OGS's actions were justified: we would apply the same level of scrutiny whether WD sought to speak in a public forum (as WD contends) or a nonpublic forum (as defendants contend).

As to the effect of classifying WD's speech as commercial, the Supreme Court's decision in *Matal* is again instructive. Joined by three other Justices, Justice Alito refused to recognize the government's "interest in preventing speech expressing ideas that

28

offend" as a "substantial interest" that could support commercial speech regulation under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). *Matal*, 137 S. Ct. at 1764-65. Similarly, Justice Kennedy concluded in his concurrence in *Matal* that the statutory provision at issue there was unconstitutional whether or not the speech was "commercial" and subject to *Central Hudson*'s relaxed standard. *Id.* at 1767. He explained that "the viewpoint based discrimination at issue . . . necessarily invoke[d] heightened scrutiny" and would "remain[] of serious concern in the commercial context." *Id.* It is possible that this "heightened scrutiny" of viewpoint discrimination in the commercial speech context is less exacting than the scrutiny applicable to viewpoint discrimination outside that context. But *Matal* instructs that viewpoint discrimination is scrutinized closely whether or not it occurs in the commercial speech context.

Reviewing the record and the parties' submissions, we perceive no governmental interest of sufficient weight to justify defendants' actions, regardless of how we might resolve the parties' disagreement over the most appropriate categorization of WD's speech (commercial speech, speech in a public forum, or speech in a nonpublic forum).

\*　　　\*　　　\*

For these reasons, we conclude that the District Court erred in entering summary judgment in defendants' favor on the question whether they violated WD's First Amendment rights by denying WD's Lunch Program applications because its truck and products were branded with language commonly seen as ethnic slurs. We further conclude that WD is entitled to summary judgment in its favor on that question. We therefore reverse that portion of the District Court's judgment and remand the case with instructions for the District Court to enter an order declaring that defendants' conduct as to both the 2013 and 2014 applications violated WD's First Amendment rights, and

enjoining defendants from denying WD's future Lunch Program applications because of WD's use of ethnic slurs in its branding.[8]

## II.     Selective-enforcement claim

Our determination under *Matal* that defendants discriminated against WD's viewpoint in violation of the First Amendment leads us to conclude that the District Court erred also in granting summary judgment in favor of defendants as to WD's selective-enforcement claim under the Equal Protection Clause. We therefore reverse this portion of the District Court's judgment as well.

To prevail on its selective-enforcement theory, WD must show "(1) that [it] was treated differently from other similarly situated businesses and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790 (2d Cir. 2007) (internal quotation marks omitted). WD argues that, while all other vendors applying to participate in the Lunch Program—including the "Slidin' Dirty" truck—were granted permits, WD's application was denied because of the exercise of its constitutional rights in branding itself and its products with ethnic slurs.

---

[8] In light of this disposition, we need not reach WD's argument that OGS's process for reviewing Lunch Program applications involved a facially unconstitutional exercise of discretion. *See Amidon*, 508 F.3d at 103 (discussing the "constitutional proscription against granting unbridled discretion in the prior restraint context"). WD's facial challenge focuses on OGS's decisions to reject otherwise eligible Lunch Program applicants who were, in OGS's estimation, insufficiently "family-friendly." In terms of relief, WD requests neither monetary damages, nor an injunction terminating the entire Lunch Program; WD seeks merely to have its application "considered on the same basis as all other applicants['] and not on the basis of its speech." Appellant's Reply Br. 22. We have already concluded that, on the facts of this case, the First Amendment prohibits OGS from denying applicants a permit solely because their branding contains language that some might find objectionable. WD does not identify any other impermissibly discretionary facets of OGS's process for reviewing Lunch Program applicants. We therefore see no need to assess WD's theory of facial unconstitutionality.

We agree with WD that its selective-enforcement claim has merit. Again, defendants do not dispute that they denied WD's Lunch Program applications because of WD's use of ethnic slurs. And although defendants have cited WD's failure to submit a complete application on time as an additional basis for denying the application, it is undisputed that other Lunch Program applications were approved despite being late or incomplete. Defendants point to nothing that distinguishes WD's application from the other applications that they approved—aside from their judgment, in violation of the First Amendment, that WD's branding was too offensive to be permitted. This demonstrates that defendants' "differential treatment was based on . . . intent to inhibit or punish the exercise of constitutional rights." *Id.*

In light of these undisputed facts, the District Court should have granted summary judgment in WD's favor. We therefore reverse the District Court's judgment as to WD's selective-enforcement claim and instruct the District Court, on remand, to include in its order of relief a declaration that defendants violated WD's equal protection rights.

### III.     Claims under the New York State Constitution

The New York State Constitution's free speech and equal protection provisions are at least as protective as their federal counterparts. *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 (2d Cir. 2013) (citing *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1278 (N.Y. 1991)) (free speech); *Brown v. State*, 674 N.E.2d 1129, 1140 (N.Y. 1996) (equal protection). We therefore also reverse the District Court's judgment as to WD's claims under the New York State Constitution and instruct the District Court to include a declaration of WD's rights to free speech and equal protection under the New York State Constitution in the order of relief.

31

**CONCLUSION**

For the foregoing reasons, we conclude that the District Court should have granted summary judgment in WD's favor and should not have granted summary judgment for defendants. Under *Matal*, defendants discriminated against WD's viewpoint and therefore ran afoul of the First Amendment, whether WD's speech is categorized as commercial speech, speech in a public forum, or speech in a nonpublic forum. Defendants' actions are not rendered permissible by doctrines applicable to government speech and government contractor speech. Although bearing some similarities to government speech and the regulation of government contractor speech, defendants' actions are properly characterized as viewpoint-based regulation of private speech. It follows from all of the above that the District Court also reached erroneous conclusions regarding WD's equal protection and New York State Constitution claims.

Accordingly, the District Court's judgment is REVERSED, and the cause is REMANDED with instructions to the District Court to enter an order that: (1) declares that defendants' conduct violated WD's First Amendment rights and enjoins defendants from denying WD's future Lunch Program applications solely because of WD's use of ethnic slurs in its branding; (2) declares that defendants violated WD's equal protection rights; and (3) declares that defendants violated WD's rights to free speech and equal protection under the New York State Constitution.